421

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X
                              :
UNITED STATES OF AMERICA

                                  CR-13-72


          -against-           :
                                  United States Courthouse
                                  Central Islip, New York

JUSTIN KALIEBE,

     Defendant.               :
                                  August 2, 2016
- - - - - - - - - - - - - - - X   1:30 p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE DENIS R. HURLEY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:        ROBERT L. CAPERS
                           United States Attorney
                           100 Federal Plaza
                           Central Islip, New York 11722
                           BY:  MICHAEL CANTY, ESQ.
                                SETH DUCHARME, ESQ.
                                JOHN DURHAM, ESQ.
                           Assistant United States Attorney



For the Defendant:         ANTHONY LA PINTA, ESQ.




Court Reporter:            Mary Ann Steiger
                           100 Federal Plaza
                           Central Islip, New York 11722
                           (631) 712-6101


Proceedings recorded by mechanical stenography.
Transcript produced by computer.

422

1          THE CLERK:  All rise.

2          THE COURT:  Good afternoon, everybody, if you

3    would all be seated, please.

4          THE CLERK:  Calling case 13-CR-72, U.S.A. vs.

5    Kaliebe.

6          Counsel, please state your appearance for the

7    record.

8          MR. CANTY:  On behalf of the United States,

9    Michael Canty, John Durham and Seth DuCharme.

10         THE COURT:  Good afternoon, gentlemen.

11         MR. LA PINTA:  On behalf of Justin Kaliebe,

12   Anthony La Pinta.  Mr. Kaliebe is seated to my left.

13         THE COURT:  Good afternoon, Mr. La Pinta, and

14   good afternoon, Mr. Kaliebe.

15         When we were last in session we put the matter

16   over until today, and the purpose was that Mr. La Pinta

17   had a rebuttal witness that he was going to call.

18         So I assume that's where we are at this point,

19   and I would ask Mr. La Pinta if you could call your

20   witness.

21         MR. LA PINTA:  Yes, your Honor.

22         The defense calls Dr. Clare Savage.

23         THE COURT:  Doctor, if you could remain standing

24   for a moment and raise you right hand.

25

423

1    CLARE SAVAGE,

2                 called as a witness, having been first

3                 duly sworn, was examined and testified

4                 as follows:

5

6                 THE COURT:  I would ask you to be seated and ask

7    you to get close to that microphone over here because the

8    acoustics are not particularly good in this room, and then

9    if you could state your first and last name and spell each

10   for the Court Reporter.

11                THE WITNESS:  Clare, C-L-A-R-E, Savage,

12   S-A-V-A-G-E.

13                THE COURT:  Thank you.

14                Mr. La Pinta.

15                MR. LA PINTA:  Thank you, your Honor.

16

17   DIRECT EXAMINATION

18   BY MR. LA PINTA:

19   Q.   Good afternoon, Dr. Savage.

20   A.   Good afternoon, Mr. La Pinta.

21   Q.   The acoustics in this room are not the best, so I

22   would ask that you scoot up as close as you possibly can

23   to that microphone and speak as loudly as you can.

24                Let me begin by asking you, Dr. Savage, are you

25   currently employed?

Savage  -  Direct/La Pinta

424

1    A.    No.

2    Q.    And what was the last job that you worked?

3    A.    I was a school psychologist at the Babylon Union Free

4    School District.

5    Q.    Would you please explain to Judge Hurley your

6    educational background?

7    A.    Yes.

8    Q.    First, before you do that, I understand that you're

9    looking at certain documents in front of you.

10            Would you please just indicate for the record,

11    so it could be written down, what you are referring to

12    when testifying, okay?

13    A.    Yes.

14            Okay.  I started my education in 1975.  I went

15    to Mary Mount Manhattan College and I earned a Bachelor of

16    Arts cum laude in psychology.

17            In January of 1977, I went to Hunter College,

18    City University of New York, and I earned a Master of

19    Science and Special Education.

20            In May 1986, I went to the City College of the

21    City University of New York and earned an advanced

22    certificate in school psychology.

23            In 2003, I went to Kennedy Western University

24    and earned a Doctor of Philosophy in Psychology.

25            In 2004, I attended a postgraduate course for

Savage   -   Direct/La Pinta

425

1    school psychologists.  That was in the neurodevelopmental

2    process oriented approach to psychological assessment.

3              Lastly, in 2011, I went to Brooklyn College of

4    the City University of New York and earned an advanced

5    certificate in autism spectrum disorders.

6    Q.    Okay.

7              Would you explain to the Court what

8    certifications you possess?

9    A.    Yes.

10             I am New York State certified as a school

11   psychologist.

12             I have a New York State certification as a

13   special education teacher.

14             And, also, New York State certification as a

15   teacher of nursery, kindergarten and grades 1 through 6.

16   Q.    And could you please indicate for the record what

17   document you are referring to when explaining your

18   history?

19   A.    My resume.

20   Q.    Are you a member of any organizations?

21   A.    I currently belong to the National Association of

22   School Psychologists.  I'm a retired member and try to

23   keep myself up to date that way.

24             I belong to the Alpha Chi, an honors society

25   from college, and that's it.

426

1    Q.    Do you have any previous memberships that have since

2    expired?

3    A.    Yes, New York State Association of School

4    Psychologists.

5    Q.    Just so we're clear, how long are you retired now?

6    A.    Yes, I am retired one year.

7    Q.    Would you explain to the Court what work history you

8    have?

9    A.    Yes.

10          My last position was with the Babylon Union Free

11   School District.

12          I worked there for 16 years, from 2001 to 2015.

13          And prior to that, I spent 13 years at Western

14   Suffolk BOCES as a school psychologist.

15   Q.    Dr. Savage, what is a school psychologist?

16   A.    A school psychologist is a person who works

17   specifically in schools and works with children and

18   families.

19   Q.    Do they service or deal with any particular student?

20   A.    Well, usually, there is a school psychologist for one

21   school or more and they actually service any student in

22   the school.

23          However, a lot of the business of the school

24   psychologist has to do with the Committee on Special

25   Education.

427

1    Q.    What do you mean by special education?

2    A.    Special education is a service that is given to

3    students who may need extra help in certain areas of

4    learning.

5    Q.    Is there any particular methodology that you use

6    while a psychologist at the Babylon School District in

7    terms of rendering services to a special education

8    student?

9    A.    Well, obviously, we do evaluations for students

10   usually every three years and we do an initial evaluation

11   when a student comes to the attention of the school

12   psychologist in that they may need something to help them

13   boost their learning curve.

14          As a school psychologist one would also do

15   counseling with students and attend the Committee on

16   Special Education to review evaluations, and sometimes the

17   psychologist chairs that meeting in order to create an

18   individual educational plan for a child should that

19   student need it.

20   Q.    When you speak of the term evaluation, could you

21   explain more particularly what the evaluation process

22   involves?

23   A.    Okay.

24          Typically an evaluation in school would start

25   off with an intelligence test or an IQ test.

428

1        And that is to give us an idea of where the

2   student is functioning, is he average, is he or she below

3   average, above average and so on.  So it gives us a sense

4   of where they're at.

5        Then usually achievement is done sometimes by

6   the psychologist and sometimes by a teacher who is

7   familiar with that student, and achievement tells us how

8   is the student doing in reading, math and other subjects,

9   and if there's a particular situation with a student we

10  may use scales or tests to determine if that student is

11  having a problem in that realm, in that area.

12       There are assessment tools that are used that

13  can -- like the behavioral assessment system for children,

14  and they come in different types of forms, sometimes a

15  self-report, the student themselves would complete a form

16  to say how they feel they're doing in school or maybe in

17  life, and then there's a parent one and a teacher one.  So

18  it gives you a broad range if you feel you need it to see

19  if the student is doing consistently in certain areas or

20  not.

21  Q.   Is it fair to say then that the evaluation portion of

22  your job's role as a school psychologist involves

23  standardized testing of the student, assessment tools that

24  are administered with the student and also personal

25  interviews with the student, the parents and the teachers;

Savage   -   Direct/La Pinta

429

1    is that fair to say?

2    A.   Yes, it is fair.

3    Q.   Now, you also explained that part of your job role is

4    to conduct counseling with the students.

5         Could you briefly explain what that involves?

6    A.   The student typically in individual counseling would

7    come to the school psychologist's office and sit down and

8    the psychologist would introduce herself or himself to the

9    student and vice versa, and just begin a conversation

10   about so why are you here today.  That's what I would say

11   to a student.  Can you tell me a little bit about

12   yourself.

13   Q.   Do those personal interviews also extend sometimes to

14   parents?

15   A.   Well, there certainly are telephone calls between a

16   psychologist and a parent.

17        For example, if the student -- the parent has to

18   be aware that a student is visiting a school psychologist

19   especially in a public setting so the parent would know

20   that their son or daughter had come to visit.

21        So typically I might make a call to that parent

22   and say I met with your son or daughter and this is what's

23   happening and I think this may be helpful or something to

24   that effect.

25   Q.   Dr. Savage, during your employment as a school

Savage  -  Direct/La Pinta

430

1   psychologist at the Babylon Public School District, did

2   you come to know a student by the name of Justin Kaliebe?

3   A.   Yes, I did.

4   Q.   When did you first meet Justin Kaliebe?

5   A.   I believe it was May of 2011.

6   Q.   Do you know how old he was then?

7   A.   Yes, about 16 years and six months.

8   Q.   How did you come to meet with him?

9   A.   Well, Justin began his schooling as a student getting

10  services from the Committee on Special Education.

11              THE COURT:  I'm sorry, could you keep your voice

12  up a little bit.

13              THE WITNESS:  I'm sorry.

14  A.   Yes.

15              Could you repeat the question?

16  Q.   Sure.

17              How did you come to meet with Justin Kaliebe?

18  A.   Justin had participated in some of the special

19  education programs through an individual education plan

20  since early on when he had speech difficulties and

21  required occupational therapy in the younger years and

22  later on you know to be in an integrated class where he

23  could get the help of two teachers for example.

24  Q.   So prior to meeting him was he involved in a special

25  education program at the Babylon School District?

Savage  -  Direct/La Pinta

431

1    A.    Yes, he was.

2    Q.    And at the age of 16 is when you first saw him; is

3    that correct?

4    A.    Yes.

5          And that was when he was in 10th grade.  I

6    believe the year before he was not in special education.

7    Q.    When he was 15 he was removed from special education?

8    A.    Yes.

9    Q.    What were the circumstances involved in removing him?

10   A.    I remember having a conversation with Mrs. Livoti,

11   Justin's mom, about saying that academically he seems to

12   be doing well.  I want to see how he does for one year

13   without it.  But then the next year I guess it was decided

14   that he would go back with the extra support and that's

15   when I met him.

16   Q.    Now I presume, since you explained the protocol of

17   fulfilling your role as a counselor, that you did meet

18   with Justin; is that correct?

19   A.    Yes.

20   Q.    And you did have conversations with his mother?

21   A.    Yes.

22   Q.    And after meeting with the two of them, what did you

23   learn of Justin's situation in school then and there, May

24   of 2011?

25   A.    Well --

432

1  Q.   Just please tell us what you're referring to, if

2  you're using that as an aid to your testimony.

3  A.   Are you asking for the results of the evaluation at

4  the time?

5  Q.   No.

6       I'm asking you what you learned upon your

7  initial interview of Justin and his mom?

8  A.   Justin was a very friendly, sweet, respectful young

9  man.  He shared how he felt about school, which sometimes

10 wasn't that great.  Sometimes things in school could be

11 tough especially for adolescents, and he was aware of that

12 and he shared that.

13 Q.   What other things did you learn of his history when

14 you met with him and his mother?

15 A.   I learned that Justin -- Justin actually belonged to

16 two families for lack of a better way of saying it.  Mom

17 remarried and at one point dad remarried.  So there were

18 two separate households.

19      Justin would, when he was at Babylon, live with

20 his mom in that household and then on the weekends would

21 visit his dad.

22 Q.   Did you make any observations of whether Justin

23 Kaliebe was suffering from depression in May of 2011?

24 A.   Yes, I would say that he was.  I know that he was

25 treated for depression and anxiety.  He was low-key, but

433

1   he was friendly in his one-to-one talks with me.

2   Q.   Did you learn of any other type of condition that he

3   was suffering from then or his history I should say.  Did

4   you learn that he had problems with truancy?

5   A.   Yes.

6        Well, there was a point where Justin I guess was

7   so depressed that he did not attend school for quite a bit

8   of time, probably two months or so, and when it gets to

9   that point, you know, then the social -- the person in

10  charge of attendance usually would be in touch to see

11  what's going on.

12       And at that point I did have a conversation with

13  Mrs. Livoti and she had said that he was very depressed

14  and didn't really get out of bed.

15  Q.   Did you come to learn of any type of therapeutic

16  treatment that he had previously experienced in his

17  younger years?

18  A.   Therapeutic treatment?

19  Q.   Such as for example --

20  A.   Yes.  When he was younger he required speech therapy

21  and also occupational therapy he had.

22  Q.   What is occupational therapy?

23  A.   Occupational therapy works with the hands, whereas PT

24  works with the larger body.  Occupational therapy works

25  with the hands.

434

```
1        I think at the time his fingers weren't able --
2    he wasn't able to use his fingers as well as he might so
3    the occupational therapist would do different exercises
4    with him to make that better.
5    Q.   Did you come to learn if he suffered from any type of
6    chronic physical health condition?
7    A.   Yes, I believe he did see a specialist for a syndrome
8    that he was diagnosed with.
9    Q.   Do you recall the name of the syndrome?
10   A.   Kallmann's syndrome.
11   Q.   Do you recall what Kallman Syndrome is?
12   A.   I think it affected growth in the early years.
13   Q.   Did there come a time, after meeting with Mr. Kaliebe
14   in a counseling session and discussing his history with
15   his mother, that you performed a litany of testing on him?
16   A.   Yes.
17   Q.   Would you please explain to Judge Hurley what testing
18   you performed on Justin Kaliebe?
19   A.   Yes.
20   Q.   Before I get there -- I'm sorry -- would you explain
21   a little bit more thoroughly why Justin was suffering from
22   the depression he was when you saw him?
23   A.   As I recall it, Justin did visit with his dad on the
24   weekends and apparently he made some good friends there.
25        I remember him telling me; there's some really
```

Savage  -  Direct/La Pinta

435

1   nice guys there.  We play basketball and we do different

2   activities together.

3           At one point I believe mom and dad decided that

4   it was decided that Justin could no longer hangout with

5   those friends.

6   Q.    When you say there, what do you mean by there?

7   A.    Where Mr. Kaliebe lives in Bayshore.

8   Q.    When you say that he wasn't allowed to spend time

9   with these people, which people are you referring to?

10  A.    Friends that he had made in his dad's neighborhood.

11  Q.    Do you know of any particular characteristics of

12  these people that he was dealing with?

13  A.    Yes, I do, because he would talk about his friends

14  who are of a different religion, Muslim religion, and

15  different faith, and he enjoyed them and they seemed to

16  embrace him and Justin seemed to really embrace them.

17  Q.    Now, do you know whether Justin was permitted by his

18  parents initially to spend time with the people you just

19  described?

20  A.    Yes, I believe he was, especially on the weekends.

21  Q.    Initially was he first permitted to spend time with

22  them?

23  A.    Yes, I believe so.

24  Q.    And did there come a time when he wasn't allowed?

25  A.    Yes.

Savage  -  Direct/La Pinta

436

1  Q.    And who made that decision?

2  A.    As I recall I believe mom and dad made the decision.

3  Q.    When that decision was made, did it have any affect

4  on Justin Kaliebe?

5  A.    Yes.

6        He became extremely depressed and I believe he

7  was refusing to take any medications and to visit the

8  psychiatrist, which was really a concern.

9  Q.    Now, let me direct you to the point in time that you

10  conducted the standardized tests that you explained.

11        If you would, Dr. Savage, go in order and

12  explain the tests that you administered to Justin Kaliebe

13  in I believe it's May you said of 2011, right?

14  A.    That's correct.

15  Q.    What's the first test you administered?

16  A.    The first test was the Wechsler Intelligence Scale

17  for Children, 4th edition at the time.  That is a

18  generalized intelligence scale.

19        And on that scale Justin earned a score of --

20  composite score of 95 at the 37th percentile.

21        To give everyone an idea, 90 to 110 is generally

22  the average pretty much that most people fall in that

23  range.

24        So Justin was at the lower end of the average

25  range.

Savage  -  Direct/La Pinta

437

1     The last time he was tested, and not by myself,

2  he earned a full scale of 104 and that was in 2006 which

3  was nine points higher but within the same range, still in

4  the average range.

5     Well, there are four composite areas in the WISC

6  4 and the first two --

7  Q.   Is the WISC 4 a commonly utilized intelligence test

8  to administer to students?

9  A.   It's probably the most commonly used intelligence

10  scale, yes.

11     So on the WISC 4 there are four composite areas.

12  The first is the verbal comprehension, and that's how does

13  the student do in verbal areas.  This was Justin's highest

14  score.  He scored a 116 at the 86th percentile.  That's at

15  the upper end of the high range.  He earned superior

16  scores in vocabulary and abstract reasoning, and social

17  comprehension fell in the high average range.  So this was

18  a very high area for Justin.

19     His non-verbal area he earned a 100 at the 15th

20  percentile.  That's right in the middle and is an average

21  score for where anyone would be.

22  Q.   What do you mean by non-verbal area, what does that

23  mean?

24  A.   When he was asked to categorize things that were the

25  same, or to generalize a situation that was posed to him,

438

1   he did fine.  Let's see.  I'll give you the two subtests

2   that were used.

3   Q.   And if you can just indicate for the record what you

4   are referring to when answering these questions?

5   A.   Yes.

6   Q.   What is it you're referring to now?

7   A.   Perceptual reasoning.

8   Q.   What document?

9   A.   The WISC 4.

10   Q.   What document is before you that you're referring to?

11   A.   It's sort of a cheat sheet that I made for myself

12   that I would be able to address each.

13   Q.   The information from the documents you have, where

14   did you obtain that information?

15   A.   From actual tests, from my report that I also have

16   here and that's pretty difficult to read because it's very

17   small print.

18   Q.   That's fine.  Continue to explain the different tests

19   that are part of the WISC 4.

20   A.   I want to say in the perceptual reasoning index he

21   scored 100.  Again, the first, the verbal comprehension he

22   scored 116, reasoning 100.

23        The tests that were used in the perceptual

24   reasoning where he earned the 100, he had to complete a

25   complex visual display and also his spacial relations.

Savage - Direct/La Pinta

439

1      He had to look at a picture and figure out from

2  a group of five what would complete that picture, so one

3  to five, and again he scored a 100.

4      The next two things on the WISC 4 or any

5  intelligence test are process scores.

6      By process scores we mean how does this person

7  take in information and how fast does he or she do it.

8      So the working memory index demonstrated a score

9  of 80 at the 9th percentile.

10      As you can see his percentiles were 86 and 50

11  and I wanted to contrast that the processes that he would

12  use on a daily basis to learn to talk to another person

13  seemed to be diminished.

14      And the next one was his processing speed.  He

15  earned a 78 which is in the upper end of the borderline in

16  the 7th percentile.

17      So when he had to do a novel task in a timed

18  situation, he had to connect symbols with numbers and he

19  had two minutes to do that, he was rather slow with it and

20  to me that shows that there was something that was keeping

21  him from moving at a faster pace or his mind was

22  preoccupied with something else.

23      The next test would be the Woodcock-Johnson III

24  test of achievement.

25  Q.   This is a separate test than the WISC 4?

Savage  -  Direct/La Pinta

440

1    A.    This is a separate test.

2    Q.    Explain what the Woodcock-Johnson test is used for?

3    A.    It tests achievement, achievement in school.  So

4    actually the teacher, Mr. Michael Russo, he's a special

5    education teacher working with Justin at the time, he did

6    the testing and broad reading earned a standard score of

7    102.  90 to 110 is average.  Broad written language a 104,

8    oral language 103, and actually his lowest was a 94 which

9    is at the lower end of the average range.  So applied

10   problems, standard score of 100 at the 5th.  You can see

11   in achievement Justin did pretty well.

12   Q.    Would you say he was above average, average or below

13   average in achievement?

14   A.    Average.

15   Q.    Did there come a time when you had him complete

16   another test?

17   A.    Yes.

18         I used a semi-structure projective technique

19   called the sentence completion test, and a student is

20   provided with the beginning of a sentence or as they call

21   it a stem and asked to complete the sentence.

22         And what this does for us is gives us an insight

23   into the student's attitudes, beliefs, motivations and

24   sometimes other mental states that the person may be in

25   and perhaps concealed feelings.

Savage  -  Direct/La Pinta

441

1       So in answer to the stems that I gave Justin, he

2   said that he described his friends as very helpful, he

3   enjoys hanging out with them and learning new things.

4       His perspective on his parents is that they are

5   protective.  Justin sees school as very educational and

6   teachers make him feel smart.

7       Justin said his mother is protective, his father

8   is lenient and his sister is very smart.  He said that

9   aloud.

10      The most important thing to Justin is his

11  philosophies/religion, one he shares with his friends.

12      He likes learning, reading and basketball.  He

13  would like to stay away from negative influences.

14      When he gets old, Justin said that he would like

15  to seek knowledge.

16      And in response to being a teenager, Justin

17  replied it's tough.

18      Finally, Justin responded to the question I wish

19  my parents knew how much I love them.

20      The next test --

21  Q.   What's the next test you conducted?

22  A.   Behavior Assessment For Children, 2nd Edition, and

23  Justin did a self-report of personality.  He rated

24  himself.  He would read questions and then rate where he

25  stood on that line, 105.  So he rated himself.

Savage  -  Direct/La Pinta

442

1    He revealed two areas of concern and these were

2    school problems and internalizing problems.

3         Attitude to school earned a T score of 68 at the

4    94th percentile.

5         Focus of control demonstrated in a T score of 60

6    in the 83rd percentile and these both areas fell in the

7    average range.

8         His T score on social stress earned 60 at the

9    84th percentile, also of concern.  So we had all these

10   concerns.

11   Q.   You said the 68th percentile was of peer stress?

12   What did you say?

13   A.   60 at the 84th percentile.

14   Q.   Of what category?

15   A.   Social stress.

16   Q.   Could you further describe what social stress is.  It

17   may be self-explanatory in a way, but is there anything

18   more to it than its plain meaning?

19   A.   Considering a 16 year old or any student, there's

20   lots of stress in a high school.  You know, there are some

21   people you may get along with and some you may not, some

22   you may like, some may not like you.  So, considerable

23   stress in that environment.

24   Q.   Did there come a time, Dr. Savage, that you

25   administered what is called a Conners 3 self-report test?

Savage  -  Direct/La Pinta

443

1   A.    Yes.

2   Q.    What is that test?

3   A.    That is again another rating scale that can be done

4   by the person, him or herself, parents or teachers.

5   Q.    What was his test result?

6   A.    Based on Justin's readings, the Conners ADHD index

7   fell in the borderline range which means the probability

8   of an ADHD classification.

9   Q.    So the record is clear, would you please explain what

10  ADHD is?

11  A.    Yes.  Attention deficit hyperactivity disorder.  Many

12  people do have that nowadays.

13  Q.    What is it?

14  A.    It is the inability to focus attention at times,

15  inability to stay still.  I think I mentioned focus.  They

16  may drift off a person who has that.

17  Q.    What was his score in that area?

18  A.    Borderline range.

19  Q.    What does that mean?

20  A.    It means that he most likely has the condition of

21  ADHD.

22  Q.    Did you administer the Conners 3 test that refers to

23  a parent reporting?

24  A.    Yes, I did.

25        This is completed by mom on July 23rd, 2011, and

444

1    I make a point of that because I had made an addendum on

2    the report which says updated 9/11 which was in September

3    when we held the Committee on Special Education meeting.

4           So the Conners, as mom reported, it was

5    summarized her results -- wait a second.  I'm sorry.  This

6    was completed by mom and received after the evaluation and

7    I wanted to explain why the 9/1/11 was on the front of the

8    evaluation.

9           Okay.  The following summarizes the results of

10   Mrs. Livoti's assessment and provides overall information

11   as to how Justin compares to the normative group.

12   Q.   What are you referring to now when you're testifying?

13   A.   Again --

14   Q.   You seem to be reading something?

15   A.   I'm reading the Conners 3 a parent report and I'm

16   about to give the results.

17   Q.   What document is that?

18   A.   This is my report, my evaluation.

19   Q.   Continue with what your findings were regarding the

20   Conners 3 parents?

21   A.   Yes.

22           Concerning inattention, there are certain

23   questions that the person would answer that would give us

24   an outcome.

25           So mom scored Justin's inattention as very

445

1   elevated, poor concentration, attention or difficulty

2   keeping his mind on work.

3          The next one was learning problems.  That score

4   was also elevated.  Inattention was very elevated,

5   learning problems were elevated.  More concerns than are

6   typically reported.

7          Academic struggles, reading, writing and

8   arithmetic, may have difficulty learning and/or

9   remembering concepts, may require extra explanations and I

10  think that's where the special education came in at times.

11         Executive function.

12  Q.   What is executive functioning?

13  A.   Executive functioning is how a person manages all of

14  the things in their life.

15         You know, in school, the best example is when a

16  report is given at the beginning of the year in September

17  and the teacher says this is due in November, November

18  12th, and the student, it's November 1st, and the student

19  says, oh, my goodness, and they scramble to get things

20  together because their organization or their focus is

21  not -- is poor.  They have poor planning and

22  organizational skills.

23  Q.   What was Justin's score in executive functioning?

24  A.   T score of 86, very elevated.

25         And the last --

446

1    Q.    When you say very elevated, is that positive

2    elevation?  What does that mean?

3    A.    Negative elevation.

4          The last one is peer relations and he earned a T

5    score of 90, which is very elevated, meaning he may have

6    difficulty with friendships, may have poor social

7    connection, may seem to be unaccepted by the group.

8    Q.    Did there come a time -- is there anymore that's part

9    of the Conners 3?

10   A.    No.

11   Q.    Did there come a time that you administered a test

12   known as the Gilliam Asperger's Disorder Scale?

13   A.    Yes.

14   Q.    When did you administer that test?

15   A.    Well, while completing the social history with

16   Mrs. Livoti, she had mentioned that she felt that Justin

17   may be suffering from something on the autism spectrum.

18   Q.    Let me stop you there.

19   A.    Okay.

20   Q.    When did you perform the Gilliam Asperger's Disorder

21   Scale?

22   A.    The same date of this report.

23   Q.    What's the date?

24   A.    5/26/11.

25   Q.    Explain to Judge Hurley what that scale involves, how

447

1  is the test administered?

2  A.   The test is administered by giving a parent or

3  someone who knows the student well how he functions on a

4  daily basis.

5  Q.   Is it common to have a parent or a guardian or

6  someone close to the subject interviewed in terms of

7  completing that test?

8  A.   Yes, it is most common to have a parent hopefully.

9  Q.   Who did you refer to with that test?

10  A.   Mrs. Livoti, mom.

11       So mom scored everything that was on the Gilliam

12  and it revealed a high level of restrictive patterns which

13  a person with Asperger's or anyone who is now on the

14  autism spectrum disorder span, that's what we call it now,

15  may have difficulty with.

16       Subtest scale scores revealed a high level of

17  restrictive patterns of behavior, cognitive patterns,

18  specific ways that he would think, and deficiency in

19  pragmatic skills.  Social interaction manifested mild

20  difficulties.

21  Q.   Are you referring to your report when you are reading

22  this material?

23  A.   Yes, I am.

24  Q.   What else could you tell us about the conclusions of

25  this Gilliam Asperger's?

Savage   -   Direct/La Pinta

448

1    A.    As provided by the GADS, there is a parent interview

2    form attached to the actual test itself, and Mrs. Livoti

3    wrote some things that she wanted to state that she views

4    Justin may need help in at the time.  This was at the time

5    of the test which was four or five years ago.

6           Mrs. Livoti stated that Justin was diagnosed

7    with developmental delays.  He does not appear to have

8    normal learning in self-help areas.  He needs

9    encouragement to do what he has to do, things such as

10   brushing teeth and toileting skills and so on.  He does

11   not take responsibility for things such as chores, putting

12   away things and similar tasks.

13   Q.    Dr. Savage, let me interrupt you for a moment please.

14          When you are reviewing Mrs. Livoti's comments on

15   this scale, did you also have an occasion to look at

16   Justin's public school records when you were doing this

17   evaluation?

18   A.    Well, public school records?

19   Q.    Records from when he first started in the Babylon

20   School District?

21   A.    Yes.

22          Well, I did see again, and I think we talked

23   about this before, early on he had speech difficulties and

24   also --

25   Q.    My question is based upon what Mrs. Livoti was

449

1   telling you, were there consistencies from other records

2   that you reviewed that were not completed by her regarding

3   her assertions?

4   A.   Yes.

5        I think certain things that were noted that

6   seemed to interfere with Justin's functioning, whether it

7   be learning in school and social behaviors, seem to be

8   pervasive throughout whatever information I received from

9   the parent or teachers or any other things I might have

10  read about him.

11  Q.   Would you say that the information that his mother

12  provided was consistent or not consistent with what you

13  knew from other records that you reviewed from his school

14  records?

15  A.   I would say it was consistent.

16  Q.   Anything else that you want to explain to Judge

17  Hurley about this Gilliam Asperger's Disorder Scale?

18  A.   Actually I could go on with some further statements

19  that mom did on the scale.

20  Q.   If you feel those are relevant in your assessment of

21  him, sure.

22  A.   Okay.  I will do that.

23       On the key question section of the instrument,

24  an answer to what specific behaviors seem the most

25  indicative of Asperger's disorder; and, again, this test

450

1   is specifically to look at the possibility of the

2   existence of this disorder.

3        So mom said, and I remember her saying this to

4   me on the phone once, that he stares up at the sky very

5   often, doesn't engage with people, would much rather be

6   alone in a room.

7        He has obsessive interests, never socializes

8   normally as a child, completely disorganized and sloppy.

9        I'm sorry for these things, but I hear this

10  about a lot of young people too.

11       He can't put certain tastes or textures in his

12  mouth or hand, and I believe that is why he needed the

13  occupational therapy when younger.

14       These behaviors occurred in all settings and

15  regardless of who was present, so the behavior is not the

16  result of another handicap condition.

17       Evaluations have been done to rule out other

18  conditions such as pervasive developmental disorder or

19  other mental disorders.

20       These evaluations were undertaken by a pediatric

21  neurologist as well as a pediatric behavioral specialist.

22  Q.   Have you performed this Gilliam test previous to

23  performing it on Mr. Kaliebe?

24  A.   Yeah, probably once or twice.

25  Q.   Is it commonly, from what you know as a school

Savage  -  Direct/La Pinta

451

1   psychologist, is it a commonly reliable instrument to

2   assess Asperger's disorder?

3   A.   Yes, it is.

4   Q.   Now you're aware, Dr. Savage, obviously that

5   Mr. Kaliebe was arrested at a time period after this

6   evaluation, right?

7   A.   Yes.

8   Q.   So that we're clear, these tests took place obviously

9   before he's arrested, right?

10  A.   Yes.

11  Q.   Do you have any idea how long before he was arrested

12  these tests took place?

13  A.   Approximately three years.

14  Q.   Now, Dr. Savage, based on your education, your

15  training or your experience for years as a school

16  psychologist, based upon the interviews with Mr. Kaliebe

17  himself and his mother, based upon the numerous objective

18  tests and scales that you utilized here that you have

19  explained, did you come to an opinion back when you

20  administered these tests as to whether Justin Kaliebe did

21  in fact suffer from Asperger's disorder?

22  A.   Yes.

23  Q.   And is it your opinion, as a trained professional in

24  this field, that based upon all the information that you

25  learned, that it is consistent with a student having

Savage   -   Direct/La Pinta

452

1   Asperger's?

2   A.   Yes.

3   Q.   Lastly, when is the last time you saw Justin Kaliebe

4   before just now?

5   A.   Pretty much around the time that I tested him.

6   Q.   When is the last time you saw his mother Debra Livoti

7   or spoke to Debra Livoti?

8   A.   Probably around the same time.

9        MR. LA PINTA:  Your Honor, I'm ending the

10   testimony with moving into evidence as the defendant's

11   next exhibit the records from the Babylon Public School

12   District at this time.

13        THE COURT:  Any objection?

14        MR. CANTY:  Your Honor, my understanding is

15   that's Exhibit C in the material that was previously

16   provided to the government, but I think they're well

17   passed C now, so whatever the next letter is.

18        It's our understanding that the material was

19   provided to us and we have no objection.

20        THE COURT:  Defendant's Exhibit C is received on

21   consent, so it's in evidence.

22        MR. LA PINTA:  Yes.

23        MR. CANTY:  Your Honor, it won't be Defendant's

24   Exhibit C because they already have moved in a number of

25   exhibits.

Savage  -  Cross/Canty

453

1                 MR. LA PINTA:  I believe it's K.

2                 THE COURT:  It's K.  It's not Defendant's

3       Exhibit C.  It's Defendant's Exhibit K in evidence on

4       consent.

5                 (Defendant's Exhibit K in evidence.)

6                 MR. LA PINTA:  Thank you.

7                 Nothing further.

8                 THE COURT:  Yes, sir.

9                 Thank you, Mr. La Pinta.

10

11      CROSS-EXAMINATION

12      BY MR. CANTY:

13      Q.    Good afternoon, Doctor, how are you?

14      A.    Fine.  How are you?

15      Q.    My name is Michael Canty.  I'm an Assistant United

16      States attorney and I'll be asking you a number of

17      questions about the testimony you just gave, okay?

18      A.    Okay.

19      Q.    I'll ask that you answer my questions yes or no if

20      possible, all right?

21      A.    Yes.

22      Q.    If you can't, let me know and I'll see if I can

23      rephrase the question for you, okay?

24      A.    Okay.

25      Q.    When you met with Justin Kaliebe, you met with him on

454

1   one occasion?

2   A.   I think it was several because there were a number of

3   tests.

4   Q.   How many times did you meet with him?

5   A.   I would say two to three times.

6   Q.   In meeting with him on those two to three occasions,

7   that was precipitated by a parental referral that came

8   from his mother, correct?

9   A.   Yes.

10  Q.   In that referral, you describe her as claiming

11  concerns of speech issues, motor delays, depression and

12  Kallmann Syndrome; is that correct?

13  A.   I believe the referral was from both parents, and so

14  the parent referral to the Committee on Special Education,

15  Debra Livoti and Robert Kaliebe explained their concerns

16  for Justin.

17       The current concerns included speech delays,

18  fine and gross motor delays, depression, anxiety and

19  Kallmann Syndrome.

20  Q.   So the answer is yes to describe the issue of

21  concerns being speech issues, motor delay, depression and

22  Kallmann Syndrome, correct?

23  A.   Correct.

24  Q.   No mention of Asperger's Syndrome?

25  A.   No.

Savage  -  Cross/Canty

455

1  Q.   No mention of possible autism disorder, correct?

2  A.   Correct.

3  Q.   And prior to you evaluating Mr. Kaliebe, you were

4  aware that he was under the care of a psychiatrist; is

5  that right?

6  A.   Yes.

7  Q.   A psychiatrist was providing counseling to

8  Mr. Kaliebe; is that correct?

9  A.   Yes.

10  Q.   And the psychiatrist is a medical doctor, correct?

11  A.   Correct.

12  Q.   Qualified to diagnose somebody with autism spectrum

13  disorder or Asperger's Syndrome at the time, correct?

14  A.   Correct.

15  Q.   And nothing in your records indicated that he had

16  been diagnosed by that psychiatrist with autism spectrum

17  disorder or Asperger's Syndrome, correct?

18  A.   Correct.

19  Q.   And he was also under the care of a pediatric

20  endocrinologist; is that correct?

21  A.   Correct.

22  Q.   Also a medical doctor, right?

23  A.   Yes.

24  Q.   And that doctor never diagnosed him with autism or

25  Asperger's Syndrome as far as you know, correct?

Savage   -   Cross/Canty

456

1   A.   Not to my knowledge.

2   Q.   And it's fair to say that those two doctors

3   collectively saw Justin on far more occasions than you saw

4   him, correct?

5   A.   Yes.

6   Q.   Now you rendered an opinion today that your opinion

7   is that at the time that you were evaluating Justin

8   Kaliebe, he was suffering from Asperger's Syndrome,

9   correct?

10          That's what you just testified to, right?

11  A.   Well, I want to clarify something.

12          In schools we don't give diagnoses.  What we do

13  is we administer tests and scales that may give a

14  probability or not of a condition.

15  Q.   I understand that, but my question is you just

16  testified under oath.  You were asked to give an opinion,

17  a professional opinion, based on your training and

18  experience as to whether or not Mr. Kaliebe was suffering

19  from Asperger's Syndrome when you were evaluating him, and

20  you said that he was; do you remember that testimony?

21  A.   Yes.

22  Q.   You gave that testimony.  You essentially have

23  diagnosed him with Asperger's Syndrome at the time that

24  you were treating him.  That was your professional

25  diagnosis in your opinion here today, right?

Savage  -  Cross/Canty

457

1    A.    Again, as a school psychologist, you cannot diagnose.

2    But being that I am retired, I can give an opinion I

3    suppose.

4    Q.    Your opinion is based on the self-reporting report of

5    the defendant's mother, correct?

6    A.    Yes but...

7    Q.    You didn't send her for traditional testing?

8    A.    No.

9    Q.    You didn't call up his psychiatrist and ask for

10   further information as to whether or not that doctor

11   thought there may have been autism spectrum disorder, did

12   you?

13   A.    No.

14   Q.    You didn't call the endocrinologist either, did you?

15   A.    No.

16   Q.    You didn't perform any independent tests on Justin

17   with respect to whether or not he suffered from Asperger's

18   Syndrome, correct?

19   A.    Yes, correct.

20   Q.    You did not?

21   A.    I did not.

22   Q.    Now, you would agree with me that a number of the

23   tests that you gave are objective tests.

24          So, for example, they ask a subject to fill out

25   information or in the case of an IQ test ask them to

458

1    perform a number of tasks and there are other tests that

2    are self-reporting so they call for an individual to opine

3    or give their opinion as to a certain set of facts, right?

4    A.    Yes.

5    Q.    For example, the Conners 3rd Edition there's a

6    parental report?

7    A.    Yes.

8    Q.    You gave that to Mr. Kaliebe's mother?

9    A.    Yes.

10   Q.    And based on her evaluation in answering a certain

11   set of questions, everything came back elevated; is that

12   fair to say?

13   A.    Yes.

14   Q.    However, the objective test that was given, the

15   Woodcock-Johnson test, all areas of achievement on that

16   test fell within the average range; isn't that correct?

17   A.    Right, but those two tests are measuring completely

18   different things.

19   Q.    I'm just asking you, there was nothing elevated in

20   those tests?

21   A.    No, because Justin is of average intelligence.

22   Q.    My question to you is it is factually true that the

23   test that was given to the mother, everything was high,

24   and the Woodcock-Johnson test, all areas of achievement

25   fell within the average range; is that right?

459

1    A.    Correct.

2    Q.    Now, is it fair to say that when an individual is

3    coming up and being evaluated by the school district, one

4    of the reasons why the evaluation is occurring is to

5    determine whether or not a student is eligible for certain

6    services, correct?

7    A.    Yes.

8    Q.    There are parents that will come in and say; my child

9    needs speech therapy, I can't understand my child, I don't

10   understand a word they're saying.  And when that happens,

11   the school district does an objective evaluation, right?

12   A.    Yes.

13   Q.    And there are often times where the school district

14   will say; mom and dad, I understand your concern.  We have

15   done objective tests and your child does not qualify for

16   services, right?

17   A.    Right.

18   Q.    That will happen and when that happens there is a

19   tendency, whether intentionally or not, that parents will

20   often times exaggerate conditions of their children in the

21   hopes of securing what they believe is the best treatment

22   for a legitimate problem they perceive, correct?

23   A.    I supposed that may be the case but --

24   Q.    I'm asking you if that's possible?

25   A.    It's possible.

Savage  -  Cross/Canty

460

1   Q.   And with respect to the report you had, Mr. Kaliebe's

2   mother filled out with respect to the GADS report?

3   A.   Yes.

4   Q.   That was all self-reported.  For example, she said

5   that he does not take responsibility for things such as

6   completes chores, putting away things and similar tasks,

7   correct?

8   A.   Yes.

9   Q.   Did you ask her to give you specific examples of what

10  she was referring to?

11  A.   Well, it's really the test form.  No, I did not.

12  Q.   So if you ask a person of an average 15 year old

13  whether or not their child does their chores or puts their

14  clothes away, you're often times going to get an answer

15  from a parent that with an adolescent that doesn't happen,

16  correct?

17  A.   Right.  That's the nature of the age sometimes.

18  Q.   You were relying, when you gave your opinion, you

19  were relying on the self-reporting from Mrs. Livoti,

20  correct?

21  A.   Yes, she's the one who completed it.

22  Q.   Did you review any of the other paperwork that she

23  submitted to determine whether or not the information that

24  you were receiving was factually correct?

25  A.   What other paperwork?

Savage   -   Cross/Canty

461

1   Q.   Well, for example, she filled out a social history

2   form?

3   A.   Yes, I did that with her.

4   Q.   She indicated on that form, quote, Justin really

5   never needed any discipline, correct?

6   A.   I don't recall that one.  I would have to look at it.

7   I don't know if I have a copy of that.

8   Q.   This is page 2.  I have underlined it.  Mom states:

9   Justin really never needed any discipline, right?  Can you

10  read that?

11  A.   Yes.

12       He was a sweet, compliant, quiet child.

13  Q.   She stated:  Justin really never needed any

14  discipline.  He's a sweet, compliant, quiet child,

15  correct?

16  A.   Yes.

17  Q.   That is inconsistent on the form?

18  A.   That was in response to when he was a younger child.

19  That's my perspective of it.

20  Q.   This is filled out when he was in the 10th grade, age

21  16 and a half years old, correct?

22  A.   Yes.

23  Q.   This was in preparation for your meeting with him,

24  right?

25  A.   Yes.

Savage  -  Cross/Canty

462

1   Q.   It goes through and asks about his family, it asks

2   about present functioning as perceived by informant,

3   correct?

4   A.   Yes.

5   Q.   And that's the headline; present functioning as

6   perceived by informant?

7   A.   Yes.

8   Q.   Then we get down to discipline, correct?

9   A.   Yes.

10  Q.   How, by whom, most effective, least effective.

11          Justin never needed any discipline.  He was a

12  sweet, compliant, quiet child.

13          That falls under the category of present

14  functioning as perceived by informant?

15  A.   Yes.

16  Q.   That would be inconsistent with the information she

17  provided on the GADS form, correct?

18  A.   When she said --

19  Q.   Would it be inconsistent with the information she

20  provided on the GADS form; yes or no?

21  A.   I'm not sure.

22  Q.   She said that -- I'll read it again.  He does not

23  take responsibility for things such as completing chores,

24  putting away things and similar tasks.  Then she says he

25  never needed any discipline, he was sweet and compliant.

Savage  -  Cross/Canty

463

1    Those are inconsistent, aren't they?

2    A.    I don't know.  Picking up clothes and being sloppy, I

3    don't know if I would equate those two.

4    Q.    Okay.

5          She also stated that and you indicated on your

6    testimony that she said he stares up at the sky and

7    doesn't engage with people, correct?

8    A.    Yes.

9    Q.    But you didn't find that when you interviewed him,

10   right?

11   A.    We were in a one-to-one situation and he was older.

12   Q.    My question to you is this was a form she filled out

13   to determine whether or not he was presently suffering

14   from autism or Asperger's Syndrome.

15         You stated your opinion today was at the time

16   you interviewed him he was suffering from that disorder.

17         One of the reasons that you based that opinion

18   on was the fact that his mother told you he stares up at

19   the sky.

20         My question to you is while you were

21   interviewing him, did he show any indication that he was

22   staring up at the ceiling?

23   A.    Well, he would sit in the chair looking the other way

24   at times and I would direct him back to me one-to-one.

25   Q.    Did you indicate that in your behavioral observation?

464

1   A.   No.

2   Q.   You stated that he was friendly, forthcoming and

3   cooperative, correct?

4   A.   Right, which he was.

5   Q.   You also said he offered appropriate and spontaneous

6   conversation and responded to all questions and tasks

7   presented, correct?

8   A.   Yes, he did.

9   Q.   That's not inconsistent with somebody who just stares

10  at the sky and has trouble interacting with people; is it?

11        Please answer my question.  Is that consistent

12  or inconsistent with the claim that he has trouble

13  interacting with other individuals?

14  A.   I think it's two separate situations, a person

15  staring at the sky and then an interaction between two

16  people.

17  Q.   Well, on the GADS form it says never socialized

18  normally as a child, doesn't engage with people, right?

19        But he had no problem engaging with you,

20  correct?

21  A.   Right, but --

22  Q.   Ma'am, please answer my question.

23        He did not have any trouble engaging with you.

24  In fact, you describe him as being friendly, forthcoming

25  and cooperative, right?

465

1   A.    That's correct.

2   Q.    And he offered appropriate, spontaneous conversation

3   and responded to all the questions and tasks presented,

4   correct?

5   A.    Right.

6   Q.    And that Justin presented as calm and content with

7   his life, right?

8   A.    Yes.

9   Q.    That was not consistent with the claim that he does

10  not engage with people, right?  He engaged with you just

11  fine, yes?

12  A.    He did but --

13  Q.    Did he engage with you?

14  A.    He did engage with me, but I'm not the typical

15  person.  He was the student and I was the school

16  psychologist.

17  Q.    You're a person, right?

18  A.    I'm a person, right.

19  Q.    In fact, you find that it would probably be difficult

20  for him to engage with an adult than a child of his own

21  age?

22  A.    I don't know.

23         In high school I think sometimes students find

24  it more difficult to engage with their peers than with

25  adults.

Savage   -   Cross/Canty

466

1   Q.   Fair enough.  Let's move on to people his own age

2   because he told you that he had made friends in Brentwood

3   where his father lived and enjoyed socializing with them

4   and playing with them, correct?

5   A.   Correct.

6   Q.   Would that be consistent or inconsistent with doesn't

7   engage with people?

8   A.   Inconsistent.

9   Q.   It would be, correct?

10   A.   Yes.

11   Q.   In fact, you said he talked about how they like to

12   play basketball and engaged in activities with one

13   another, right?

14   A.   Yes.

15         He finally found friends that embraced him and

16   that he embraced.

17   Q.   Knowing that, would that change your opinion as to

18   whether or not he was suffering from Asperger's Syndrome

19   or autism at the time you interviewed him when you knew

20   that he was not having trouble engaging with people,

21   especially people his own age?

22   A.   I'm not sure.  Could you repeat the question?

23   Q.   Would it give you pause -- you have given this

24   opinion today that when you interviewed him he was

25   suffering from Asperger's Syndrome.  You relied on the

467

1   statement that his mother gave that he doesn't engage

2   normally with people as one of the reasons, yet he engaged

3   with you, he described how he engaged with his friends and

4   participated in activities and placed basketball.

5         Would that give you pause as to the opinion you

6   gave today knowing that there's an inconsistency there?

7   A.   No.

8   Q.   Okay.  All right.

9         When you were interviewing him he understood all

10  the questions you were asking him, correct?

11  A.   Yes.

12  Q.   It's fair to say there was nothing in your interview

13  that indicated to you he didn't understand right from

14  wrong, right?

15  A.   Right.

16  Q.   In fact, he had, when you talk about his verbal

17  comprehension index score, that was well above average,

18  right?

19  A.   Yes.

20  Q.   Back to the issue with respect to what his mother

21  said, she claimed that he never socialized normally as a

22  child, was completely disorganized and sloppy, right?  We

23  talked about that.

24        She also claimed he was a sweet, compliant,

25  quiet child, right?

468

1    A.    Right.

2    Q.    When you interviewed the defendant he was well

3    groomed, correct?

4    A.    Yes.

5    Q.    He had an appropriate haircut?

6    A.    Yes.

7    Q.    Was appropriately dressed?

8    A.    Yes.

9    Q.    Didn't appear sloppy to you?

10   A.    No seemed like a normal high school-aged kid.

11   Q.    Normal high school-aged kid.

12         Did that give you pause knowing his mother made

13   representations in that report with respect to him being

14   sloppy and what you saw was inconsistent with that?

15   A.    I think she may have been describing -- you know, he

16   was coming to a person's office for a particular reason,

17   the evaluation.  I think maybe he would have thought to,

18   okay, I better change the clothes I have been wearing.

19   Q.    Well, do you know that?

20   A.    I don't know that for sure.  I wasn't there.

21   Q.    Was he pulled out of class to come see you?

22   A.    Most likely.

23   Q.    Was he aware this was going to happen in advance?

24   A.    I'm not sure of that.

25   Q.    He also indicated that he had a group of friends that

Savage   -   Cross/Canty

469

1    we talked about, right, that he socialized with, right?

2    A.   Yes.

3    Q.   You described -- withdrawn.

4         You describe him in your evaluation as being a

5    caring individual; do you remember that?

6    A.   Yes.

7    Q.   It's fair to say that based on your evaluation of

8    him, he understood what empathy was?

9    A.   Yes.

10   Q.   He understood right from wrong?

11   A.   When he described his family he had things to say

12   about them.

13   Q.   He understood the consequences of certain actions, or

14   are you not qualified to answer that?

15   A.   I really don't know.

16   Q.   When you met with him he demonstrated appropriate

17   emotion, right?

18   A.   Yes.

19   Q.   Now, in your career, you worked at BOCES and as a

20   school psychologist, correct?

21   A.   Correct.

22   Q.   Did you ever treat individuals privately?

23   A.   No.

24   Q.   Never?

25   A.   No.

Savage  -  Cross/Canty

470

1        And that's where I make the distinction between

2    being a school psychologist and a psychologist who works

3    in private practice.

4    Q.    Did you ever have occasion to specifically treat

5    people with Asperger's Syndrome?

6    A.    Well, you mean at school?

7    Q.    I'm saying treat them privately or otherwise?

8    A.    No.

9    Q.    This is the first time every today, the first time in

10   your professional career, where you ever opined that

11   somebody was suffering from Asperger's Syndrome or autism

12   spectrum disorder, correct?

13   A.    Well, being employed where I was --

14   Q.    My question is --

15            MR. LA PINTA:  Objection.

16            MR. CANTY:  Judge, I asked for a yes or no

17   answer.

18            MR. LA PINTA:  She's not finished with her

19   answer before he's interrupting.

20            THE COURT:  Ask the question again and just

21   listen to the question and answer the question as

22   succinctly and accurate as you can.

23            And if Mr. La Pinta wants to pursue a further

24   line of inquiry based on what transpires during the

25   cross-examination, he will do so.

471

1    But you were in the process of volunteering

2    information that wasn't really necessary.

3    That being said however, if you're asked a

4    question which you cannot answer yes or no, if it's a more

5    nuanced question and calls for a greater explanation, just

6    so indicate to Mr. Canty and he will have the option of

7    permitting you to testify or ask you another question, all

8    right?  Do you have the ground rules down?

9    THE WITNESS:  Yes, Judge.

10    BY MR. CANTY:

11    Q.   This is the first time in your professional career

12    that you have ever opined that someone suffers from

13    Asperger's Syndrome or autism spectrum disorder, correct?

14    A.   No.

15    Q.   You've given that diagnosis before?

16    A.   No, I was never able to give a diagnosis because I

17    was employed by the school system and was a school

18    psychologist and now retired and what I was going to

19    say --

20    Q.   There is no question being posed, ma'am.

21    My question to you now is the purpose of this

22    evaluation was to make recommendations, correct?

23    A.   Yes.

24    Q.   And nowhere in your report did you ever recommend

25    that there should be follow-up done to determine the

472

1   severity or the veracity of the claim that the defendant

2   was suffering from Asperger's Syndrome or autism spectrum

3   disorder, correct?

4   A.    That's correct, but that's because --

5   Q.    Ma'am, my question is you don't recommend follow-up

6   to a psychiatrist, to a school district psychiatrist, to a

7   psychologist or private referral by the parent to

8   determine whether or not Mr. Kaliebe was in fact suffering

9   from Asperger's Syndrome or autism spectrum disorder,

10   correct, yes or no?

11   A.    No.

12   Q.    And, in fact, in your report you write Justin has --

13   at the end of your report, you write:  Justin has

14   undergone somewhat of an awakening and he has made what

15   seems to be a positive association with other youngsters

16   his age who live near his father.

17         These friends happen to be from a difficult

18   culture and religion.  Justin has embraced this group of

19   friends and their ideals.

20         In this regard, he's chosen to discontinue his

21   medication and outside therapy.

22         You would agree with me that that, the fact that

23   he was developing new friendships, has what you described

24   as an awakening, would be inconsistent with the claims

25   that his mother made that you based your opinion that he

473

1   was suffering from Asperger's Syndrome or autism spectrum

2   disorder, correct?

3   A.   I'm sorry.  I don't know how to answer that.

4   Q.   Let's break it down then.

5        What information was given to you that led you

6   today to give the opinion that the defendant was suffering

7   from Asperger's Syndrome or autism spectrum disorder?

8   A.   The fact that he started very early on in special

9   education, and then continued to have social and

10  communication difficulties during the years.

11  Q.   How would you describe -- do you know the clinical

12  definition of autism spectrum disorder?

13  A.   Autism spectrum disorder is now what the DCM V is

14  using and it's on a line of how severe one can react to

15  the world, do they communicate regularly, do they

16  socialize, to what extent does he or she do that.

17  Q.   What information did you have that led you to give

18  that opinion today specifically?

19  A.   I did have the results of the GADS.

20  Q.   Let's go through that.

21       Tell me specifically what led you to believe to

22  give that opinion today?

23  A.   Well, the GADS responses by mom said he displayed

24  social and communication difficulties over the years

25  and --

Savage  -  Cross/Canty

474

1   Q.   That's one.   Communication difficulties.

2        What else?

3   A.   Social.

4   Q.   Socializing with people, right?

5   A.   Right.

6   Q.   What else?

7   A.   Restrictive patterns of behavior.

8   Q.   Restricted patterns.

9        What else?

10  A.   Cognitive patterns, his own way of thinking.

11  Q.   You tested that, the way he thinks?

12  A.   I tested his abilities and his levels, not the way he

13  thinks.

14       In the projective you might get some insight

15  into the way he thinks.   On the intelligence scale you get

16  at what level is he able to learn and take in new

17  information.

18  Q.   Let me ask you this and you can tell me if I'm wrong.

19       We have that he stares up at the sky, doesn't

20  engage with people, would much rather be alone in a room

21  obsessive interests, never socialized normally, completely

22  disorganized and sloppy, right?

23       Those were in your report?   Those are the

24  factors that his mother provided to you, correct?

25       And then we have certain tastes and textures,

475

1    right?

2    A.    Yes.

3    Q.    With respect to would much rather be alone in a room,

4    completely disorganized and sloppy, that would pretty much

5    describe almost every adolescent in the United States?

6    A.    Being sloppy would, but the other things wouldn't.

7    Q.    So like communication difficulty, you talked about

8    that one?

9    A.    Yes.

10   Q.    You had information that wasn't in fact correct

11   because he had friends he was socializing with and he was

12   engaging in activities with his peers, right?

13   A.    That was at one point, yes.

14   Q.    At the time you were doing your interview, he told

15   you that?

16   A.    At one point, right, where he found new friends.

17   Q.    And socializing with people, he was hanging with his

18   friends playing basketball and socializing with them?

19   A.    Yes.

20   Q.    Despite all that objective evidence that was reported

21   to you by Mr. Kaliebe, it's still your opinion today he

22   was suffering from Asperger's Syndrome and autism spectrum

23   disorder when you conducted your interview?

24   A.    Again --

25   Q.    That was your diagnosis?

476

1    A.    First of all, during my whole career as a school

2    psychologist we never diagnose.  We can never say for sure

3    as a psychiatrist or a psychologist who treats people on

4    the outside that we cannot give a diagnosis.

5           We can say that person seems to have some

6    qualities of this specific thing, but we can't say he has

7    depression, he has anxiety, he seems to be on the autism

8    spectrum.

9    Q.    Forgive me.  My question to you is this.

10          You gave an opinion.  You're a doctor.  Isn't

11   that a diagnosis?  You're saying my opinion was when I

12   interviewed him at the time he was suffering from autism

13   spectrum disorder and Asperger's Syndrome.  You testified

14   to that, correct?

15   A.    That was based on information provided to me by other

16   people.

17   Q.    So you would agree with me if that information was

18   incorrect, that wouldn't be -- your opinion wouldn't be

19   valid?

20   A.    I think it seems like we're mixing things.

21   Q.    I'll back up.

22          You gave an opinion today that at the time you

23   interviewed Mr. Kaliebe, that your professional opinion as

24   a doctor, psychologist, is that he was suffering from

25   autism spectrum disorder and Asperger's Syndrome, right?

Savage   -   Cross/Canty

477

1    A.    I may have said that it would seem that he's

2    suffering from that.

3              But, again, at the time that I was functioning

4    as a school psychologist, the school psychologist can't

5    make that determination. That's why we go to medical

6    doctors and outside therapists.

7    Q.    So you would agree they would be in a much better

8    position, professional psychologists, to make a

9    determination with respect to what conditions the

10   defendant was suffering from at the time?

11   A.    Even the Committee on Special Education couldn't make

12   that statement.

13   Q.    What is your opinion then?

14   A.    My opinion is that Justin had a complex difficult

15   life and can I say what I would like to say?

16   Q.    I asked you what your opinion was.  Feel free.

17   A.    Okay.

18             I think we all heard the story about the middle

19   child in a family, right, the middle child always feels

20   like they never get enough, or because there's an older

21   sibling who came first and the younger one who is the cute

22   little new one.

23             In this case, Justin had to deal with two

24   different homes, two different destinations and I think he

25   was lost.

478

1   Q.   I think I understand that.  That may very well be the

2   case.

3          My question is what is your opinion with respect

4   to him suffering from autism?

5          It's a very different question as to whether or

6   not he had a difficult childhood.

7   A.   I cannot say whether or not he has a diagnosis of

8   autism spectrum disorder, but I can say that it has been

9   witnessed by things that he needed in school, the special

10  ed, that he needed assistance, and also the fact that he

11  required special education for all of his life.

12  Q.   Understood.

13         My last question is in January 2013, you have no

14  idea what his mental condition was at the time he was

15  arrested, correct?

16  A.   No, the last time I saw him was when I evaluated him.

17            MR. CANTY:  Nothing further.

18            THE COURT:  Thank you, Mr. Canty.

19            Mr. La Pinta.

20            MR. LA PINTA:  Very briefly.

21            Thank you, your Honor.

22

23  REDIRECT EXAMINATION

24  BY MR. LA PINTA:

25  Q.   Dr. Savage, when you were conducting the various

479

1   tests that you explained to the Court, and when you

2   performed the Gilliam Asperger's Disorder Scale, was there

3   anything that you learned that would lead you to the

4   belief that the information that you were provided was

5   exaggerated or untrue?

6   A.   No.

7   Q.   You were asked questions on cross-examination as to

8   whether you followed-up after this evaluation.

9            Explain to the Court where Justin attended

10  public school after your evaluation?

11  A.   I believe Brentwood.  He switched school districts.

12  Q.   To your knowledge, did he ever return back to the

13  Babylon School District?

14  A.   I wouldn't know.

15           The year I tested Justin, at the end of the

16  2010-11 school year, that September, I went to the grade

17  school to work.

18           I was in the grade school for the remainder of

19  my years in Babylon until I retired, so I had no

20  information about him at all.

21  Q.   Is it fair to say then that you had an inability to

22  follow-up with different findings that you made of Justin

23  due to the fact that he wasn't in the district and you

24  weren't there any way, right?

25  A.   Yes, absolutely.

480

1   Q.   You were asked -- one of the last questions on direct

2   examination -- as to whether you had an opinion of whether

3   Mr. Kaliebe suffers from Asperger's Syndrome disorder and

4   you said you did, right?

5   A.   If I thought he did, not that it was my diagnosis.

6   Q.   That's my question.

7           Explain to Judge Hurley the difference between

8   your opinion and an official diagnosis?

9           THE COURT:  I think I understand that.

10          MR. LA PINTA:  That's great.

11   BY MR. LA PINTA:

12   Q.   Lastly, your conclusions were based upon your

13   findings in 2011, right?

14   A.   Yes.

15          MR. LA PINTA:  Nothing further.

16          THE COURT:  Thank you, Mr. La Pinta.

17          Is there any further questions based on the

18   redirect?

19          MR. CANTY:  No thank you, your Honor.

20          THE COURT:  All right.

21          Doctor, thank you very much.  You may step down.

22   You're excused.

23          THE WITNESS:  Thank you, Judge.

24          (The witness steps down.)

25          THE COURT:  Any further witnesses to be called

481

1    by the defense?

2                MR. LA PINTA:  No, your Honor.

3                THE COURT:  Any further witnesses by the

4    government?

5                MR. CANTY:  No thank you, your Honor.

6                THE COURT:  This hearing is obviously concluded.

7           Now the question is how should we proceed to the

8    remainder of the Fatico hearing, the hearing being the

9    sentencing proceeding.

10          As things now stand, I don't know how much time

11   counsel needs if anything beyond a few weeks.  Would the

12   government be ready to proceed to sentence in two weeks?

13               MR. CANTY:  Yes, your Honor.

14               THE COURT:  The defense as well?

15               MR. LA PINTA:  I'm not only because, your Honor,

16   I'm leaving for vacation on Thursday.  I'm coming back in

17   two weeks and five days later I'm starting a trial before

18   Judge Donnelly in Brooklyn and I'll be engaged on trial

19   probably for two to three weeks.

20               THE COURT:  So the question is whether we can

21   fit it in.  I'm not suggesting we should.  If we could,

22   that's one option.  Another one would be until after the

23   case with Judge Donnelly reaches its conclusion, what

24   would you prefer?

25               MR. LA PINTA:  I would prefer we do it after

482

1   because when I return I have to prep for that trial.

2           THE COURT:  I don't see a problem with that.

3   Any problem with the government?

4           MR. CANTY:  No, your Honor.

5           THE COURT:  Let's pick a date.  I'll look at

6   Mr. La Pinta to go through the mathematics.  When do you

7   think specifically you'll be free?

8           MR. LA PINTA:  My trial will conclude the latest

9   by September 16th.  If I could then have two weeks to

10  prepare, I would like to be able to, if the Court would

11  like, to prepare a submission on certain points in this

12  Fatico hearing.  I would like two weeks to do that and

13  then after that submission the Court can set whatever date

14  you would like for that sentencing hearing.

15          THE COURT:  I would like to set a date now.

16  It's always subject to being adjusted.  I would suggest

17  October 7th and we will do that in the afternoon, maybe

18  2:00 or something, so 2:00 on October 7th.

19          THE CLERK:  2:30.

20          THE COURT:  On October 7th.

21          How much time do you want to submit this?

22          MR. CANTY:  Your Honor, my colleague made a

23  valid point.  I don't know how lengthy the hearing is

24  going to be, but the defendant has to be transported back

25  to the MDC.  There may be transportation concerns.

483

1          THE CLERK:  11:30.

2          MR. CANTY:  Yes.

3          THE COURT:  Mr. La Pinta, is that satisfactory?

4          MR. LA PINTA:  Yes.

5          THE COURT:  Rather than 2:30 it will be 11:30.

6          MR. LA PINTA:  Regarding submissions, if I may

7   have until September 30th for submissions.

8          THE COURT:  The government may want to respond.

9   Let's make it the 28th for your submission and then if I

10  could get the Government's papers in response, if any,

11  they would be due on the close of business on October 4th.

12  And then if there's any thought there should be a reply,

13  we can do that by oral argument and discussion on the date

14  designated, October 7th.

15          Is everybody squared away on the scheduling?

16          MR. CANTY:  Yes, your Honor, thank you.

17          MR. LA PINTA:  Yes.

18          THE COURT:  I don't think there's anything

19  further we should do today.

20          I know that counsel has been ordering the

21  transcript and I would like to be included in the people

22  to receive the transcript.

23          Anything further?

24          MR. CANTY:  Nothing from the government, your

25  Honor.

484

1          MR. LA PINTA:  No, thank you.

2          THE COURT:  Very good.  Thank you.

3          MR. CANTY:  Your Honor, may I have a moment?

4          THE COURT:  Yes.

5          MR. CANTY:  Your Honor, we're going to meet with

6   your courtroom deputy to make sure you have a full and

7   complete set of the exhibits that the government has moved

8   in in the Fatico hearing, and we would ask that the

9   defense do the same so the Court has every exhibit that

10  was moved in.

11         THE COURT:  Check with Lisa to make sure I have

12  everything.

13         MR. LA PINTA:  Yes.

14         MR. CANTY:  Thank you, your Honor.

15         THE COURT:  Very good.  Thank you.

16         (Proceedings in this matter are concluded.)

17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2

 3  Witnesses                                    Page

 4

 5    CLARE SAVAGE                                423

 6

 7  DIRECT EXAMINATION

 8  BY MR. LA PINTA                               423

 9

10  CROSS-EXAMINATION

11  BY MR. CANTY                                  453

12  REDIRECT EXAMINATION

13  BY MR. LA PINTA                               478

14

15                  E X H I B I T S

16                                                Page

17

18

19  Defendant's Exhibit K in evidence            453

20

21

22

23

24

25
```