

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JJD:SDD
F. #2012R00095

*610 Federal Plaza*
*Central Islip, New York 11722*

December 8, 2016

<u>By Hand and ECF</u>

Honorable Denis R. Hurley
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, New York 11722

        Re:  <u>United States v. Justin Kaliebe</u>
             <u>Criminal Docket Number 13-072 (DRH)</u>

Dear Judge Hurley:

      The government writes to respond to the post-hearing brief dated October 10, 2016 ("Def. Br.") submitted by the defendant Justin Kaliebe, also known as "Umar Abdur-Rahman," "Justin Russi" and "Omar," in the above-referenced case, in which the defendant argues that the evidence adduced at the hearing "provided an overwhelming record for mitigation." (Def. Br. at 1). For the reasons set forth below, the government respectfully disagrees with the defendant's characterization of the record. The testimony and exhibits admitted during the hearing are clearly relevant to the Court's consideration in imposing sentence because they address the nature and circumstances of the offense and the history and characteristics of the defendant. However, the record offers little support for leniency in sentencing when considered in light of all of the sentencing factors set forth in Title 18, United States Code, Section 3553(a). Accordingly, to promote respect for the law, provide just punishment for the offense and protect the public, the government maintains that a below-Guidelines sentence of 24 years' imprisonment, to be followed by a term of supervised release, is appropriate in this case.[1] Sentencing is currently scheduled for December 19, 2016.

---

[1] This letter supplements the government's previously filed sentencing submission, dated September 8, 2014. To avoid repetition, the government incorporates and relies upon facts and analysis set forth in the prior submission.

I.      Background

The government assumes the Court's familiarity with the detailed facts set forth in the government's prior sentencing submission, which described the defendant's criminal conduct that culminated in his arrest, after he attempted to board a flight to the Middle East to join a terrorist organization. Following the defendant's arrest, on February 8, 2013, the defendant pled guilty, pursuant to an agreement with the government, to an Information charging him with: (1) attempting to provide material support to terrorists in furtherance of a conspiracy to commit murder in a foreign country, in violation of Title 18, United States Code, Section 2339A(a); and (2) attempting to provide material support to a foreign terrorist organization, al-Qaeda in the Arabian Peninsula ("AQAP"), also known as Ansar al-Sharia ("AAS")[2], in violation of Title 18, United States Code, Section 2339B(a)(1). After his arrest, and for several months following the entry of his plea, the defendant met with investigators and provided information relating to his offense conduct. However, after his plea, the defendant ceased cooperating in an ongoing terrorism investigation, despite good faith efforts by counsel to encourage him to continue. He thus breached his agreement with the government. Accordingly, the defendant was not available to testify in the matter involving his codefendant, and it took investigators several more months to build a case against Ali Zea.[3]

The defendant's case was originally assigned to the Honorable Arthur D. Spatt. On May 27, 2014, Judge Spatt recused himself. (ECF # 83). The cases were later reassigned to the Honorable Sandra J. Feuerstein. Although Kaliebe was convicted before Zea, Zea was the first of the two defendants to be sentenced. Judge Feuerstein imposed a sentence of twenty-five years' imprisonment. On March 6, 2015, Judge Feuerstein was recused, and the defendant's case was transferred to Your Honor. In his February 16, 2015 reply to the government's sentencing submission ("Def. Reply"), in addition to presenting his Guidelines and Section 3553(a) arguments, the defendant requested a Fatico hearing to address purportedly mitigating facts relating to the defendant's personal characteristics and the circumstances of his arrest. (Def. Reply at 1-2). In his request for a hearing, the defendant asserted that "[t]he hearing should be held to address the following issues: (1) Whether [the defendant] acted under a diminished capacity when he interacted with the Government's undercover law enforcement operatives; and (2) Whether [the defendant] extensive medical, mental and social history is supported by evidence that should be

---

[2] AQAP and AAS are collectively referred to herein as "AQAP."

[3] The defendant and Zea began planning to join AQAP in or around the fall of 2011. Zea came to the attention of investigators in January 2012, when his efforts to join the terrorist group were thwarted by British authorities. Zea was returned to New York after being detected at Heathrow Airport in London en route to Yemen. Investigators were unable to immediately arrest Zea upon his return. Zea continued to advise and encourage Kaliebe in the defendant's own efforts to join AQAP even after Zea had been turned around at Heathrow.

considered by the Court, under Section 3553(a), as mitigation for his crimes." (Def. Reply at 2).

The Probation Department has determined that the defendant's total offense level is 37, which provides for an advisory Guidelines range of 360 months to life imprisonment within Criminal History Category VI, based on the application of the terrorism enhancement. He faces no mandatory minimum sentence. The Court may impose a term of supervised release up to life. Because the counts of conviction have a combined statutory maximum of 30 years' imprisonment, the defendant's effective Guidelines term of imprisonment is 360 months. (Pre-Sentence Investigation Report ("PSR") at ¶ 91). The government has acknowledged that a modest downward departure may be appropriate in this case, based on certain arguably mitigating factors relating to the defendant's age and physical condition as well as in recognition of the limited assistance he provided to the government prior to his breach of his agreement with the government. Because of the seriousness of the offense, however, the government continues to oppose a substantial downward variance from the Guidelines, respectful of the need to impose a sentence sufficient but not greater than necessary to satisfy the statutory sentencing factors and to avoid unwarranted sentencing disparities.

II.     Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted).

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed--

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). "[I]n determining whether to

3

impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Where, as here, a party raises questions of fact that may be relevant to sentencing, the Court may conduct a hearing in order to elicit information helpful in resolving those issues. "Evidentiary hearings to resolve factual disputes related to sentencing are commonly referred to as Fatico hearings after United States v. Fatico, 603 F.2d 1053 (2d Cir.1979)." United States v. Graham, 610 F. App'x 56, 57 n.1 (2d Cir. 2015). "Although the Sentencing Guidelines do not specify a burden of proof to govern the resolution of disputed sentencing factors, the Second Circuit has held that the preponderance of the evidence standard satisfies the requirements of due process in determining conduct relevant to sentencing issues under the Guidelines." United States v. Salim, 287 F. Supp. 2d 250, 305–06 (S.D.N.Y. 2003) (citations omitted).

### III. The Hearing Record

At the hearing, the defendant called: (1) Debra Livotti, the defendant's mother; (2) Jamie Livotti, the defendant's sister; (3) Dr. Jason Hitner, the defendant's pediatrician; (4) Bilal Hito, a local religious teacher who observed and interacted with the defendant when he attended mosque; (5) Dr. Alexander Bardey, who conducted an examination of the defendant while in custody; and (6) as a rebuttal witness, Dr. Clare Savage, a school psychologist. The government called Dr. N.G. Berrill, a forensic psychologist, and Detective Jody Almodovar, from the FBI/NYPD Joint Terrorist Task Force. In addition to the live testimony of the witnesses, the parties introduced a number of exhibits, which included, inter alia:

- the expert reports of Dr. Bardey and Dr. Berrill;

- a photograph of the defendant with Ali Zea, taken during the relevant time frame;

- three recordings of interactions between the defendant and an undercover law enforcement officer ("UC1"); and

- an email communication from the defendant to another undercover government employee ("UC2"), in which the defendant pledged his allegiance and services to AQAP.

As set forth in greater detail below, as a result of the hearing, three conclusions emerge: (1) the defendant faced challenges as a young man, due to his unusual medical condition and personal characteristics; (2) the defendant has a supportive family, in particular his mother, who ensured that he received treatment for those conditions throughout his life, but despite all the treatment efforts and his family's support, he attempted to join AQAP and wage jihad; and (3) most significantly, the defendant was able to discern right from wrong during the entirety of his terrorism offense conduct, up to and including the point where he rejected UC1's suggestion that there are nonviolent ways by which he could observe his religious beliefs. Thus, the principal matters in dispute for the Court's consideration are: the extent to which the defendant's medical condition is material to the Court's sentencing analysis; and not whether, but rather <u>the extent to which</u>, the defendant appreciated the consequences of his actions.

> A. The Defendant's Physical and Emotional Attributes
>    Do Not Excuse His Decision to Join a Terrorist Group

The government does not dispute that the defendant suffers from unusual medical conditions. The defendant's diagnosis of Kallman's syndrome (characterized by delayed or absent puberty) appears to be well-founded, but treatable. The record demonstrates that the defendant received treatment for this condition throughout the time period of the criminal conduct, which negates the argument that it somehow mitigates his conduct or his decision to join a terrorist organization. His mental health condition is more enigmatic. As Dr. Berrill testified, the post-conviction, <u>ad hoc</u> diagnosis of Asperger's syndrome, a highly complex disorder, based on limited information, is questionable. (<u>See</u>, <u>e.g.</u>, Tr. 334) ("I'm not convinced that he does [suffer from Asperger's syndrome]"). Even assuming for the sake of argument that the defendant was properly found to be somewhere on the autism spectrum, there remains the fundamental question of the relevance of this diagnosis to sentencing, in light of all of the other facts adduced at the hearing.

After acknowledging certain aspects of the defendant's physical and mental condition, Dr. Berrill explained:

> Q. With respect to the diagnostic impression, did any of these that you found affect the defendant's ability to understand right from wrong?
>
> A. Not at all. Not at all.
>
> Q. Did any of them affect the defendant's ability to understand the consequences of his actions?
>
> A. Not at all.

(Tr. 298). To be sure, some of the defendant's physical characteristics as well as some of painful childhood experiences, engender sympathy, but there is no reliable evidence that these characteristics played any material role in his commission of the offenses of conviction. In other words, from an understanding of the defendant's difficult childhood, it may be fairly inferred that the defendant would appreciate the welcoming community of the local mosque, at which he was described as a "lap child." (Tr. 160). It is a greater leap, however, to suggest that, based on his medical condition, he would then be more likely to align himself with Ali Zea, an extremist within that group, and form a secretive, nefarious relationship. The record makes clear that the defendant had the support of a caring family, his school psychologist, his pediatrician and peaceful members of his religious community. Yet he chose a path towards violence.

   Moreover, the record makes clear that despite appearing to be physically and emotionally vulnerable and perhaps susceptible to pressure, the defendant on more than one occasion stood up for himself and his chosen beliefs. Dr. Bardey, the defense expert, acknowledged this was so:

> Q. So, quitting a club because he perceives that children of color were being discriminated against, that would be perceived as appropriate conduct for somebody who believes that is incorrect?
>
> A. That's fair to say.
>
> Q. Quitting a Police Explorer's Organization that he perceived to be engaged in racial profiling, that would also be appropriate in determining right from wrong?
>
> A. Sure.
>
> Q. In two instances, these are authorities that he was essentially saying you're wrong and I'm going to step aside because I know right from wrong, right?
>
> A. Correct.
>
> Q. And bullies, bullies are perceived as powerful individuals, and in one instance he, Mr. Kaliebe, told you he stood up to bullies, right?
>
> A. Yes.
>
> Q. He took on -- bullies succeed because they exert either physical or psychological authority over other individuals, correct?
>
> A. Fair to say.

6

>    Q.  He was able to stand up to that physical and psychological power and say "stop?"
>
>    A.  Precisely.

(Tr. 260).  So clearly the defendant had the capacity, from an early age, to reject people and ideas with which he disagreed.  And yet, the defendant did not reject the terrorist ideology of al-Qaeda and his codefendant, Ali Zea.  Nor did he reject ideas posited to him for purposes of vetting his intent by UC1 and UC2.  Thus, while the defendant claims that his pre-existing physical and emotional conditions are materially mitigating with respect to the defendant's decision to join a terrorist group, the evidence introduced during the hearing establishes that they are not.

### B.  The Defendant Appreciated the Seriousness of His Offense Conduct

The defendant's own mental health expert found that he was able to discern right from wrong during the commission of the charged offenses.  Dr. Bardey testified that "Mr. Kaliebe knew what he was doing, and it's clear from the evidence that he understood the nature of his act and he even understood the consequence and knew that it was wrong," but added, "in my opinion, the problems with his development, his social issues prevented him from really appreciating [it]."  (Tr. 229).  The defendant thus asserts that while he was able to clearly discern right from wrong, he failed to "really" appreciate the consequences of his actions.  In considering this question, the Court has the benefit of being able to hear the defendant in his own words explain his understanding of the crime during the relevant time frame.  At the hearing, the government admitted into evidence three transcribed recorded conversations between the defendant and UC1, as well as an email from the defendant to UC2, all of which contained explicit statements relevant to the defendant's understanding of the nature and consequences of his actions.

For example, in the June 4, 2012 audio recording that was introduced into evidence as Government's Exhibit 101, the defendant told UC1 that AQAP member Samir Khan had inspired him, and that he was reading "Proud to be a Traitor," an article written by Khan, which explained how Khan traveled to Yemen.  During this conversation, the defendant explained the relationship between AAS and al-Qaeda, noting that al-Qaeda is a network, and that a sub-branch of al-Qaeda is AAS.  It is clear from this recording that the defendant, not UC1, was informing their conversation about terrorism.

The defendant also asserted that al-Qaeda was no longer sending secret cells to Western countries, but instead was pursuing "lone wolf terrorism."  When UC1 directly asked the defendant whether "lone wolf terrorism" was what the defendant was pursuing, the defendant distinguished his conduct, citing Abdulmutallab, the attempted Christmas Day 2009 underwear bomber, as an example of a "lone wolf."  The defendant then stated, "I don't know what they'd call us, to kill, maim and kidnap in foreign countries, conspiracy to do that, that's basically the crime that they would charge people like us with."  (Gov. Ex. 101, Tr. 371-3).  The defendant's reference was clearly to the language of Title 18, United States Code, Section 956, which makes it a crime to "conspir[e] to kill, kidnap, maim, or injure

7

persons or damage property in a foreign country," a statute often used to charge terrorists in this district. Indeed, it is the predicate charge for Count One of the Information to which the defendant pled guilty, and it was the top count in the indictment of Ali Zea. Rare is the case where a defendant is so aware of the unlawfulness of his conduct as to actually quote the federal criminal code that applies to him during the commission of his offense.

In addition, there can be no doubt that the defendant knew his support for AQAP was de facto support of violence against Americans. The audio recording admitted into evidence as Government Exhibit 102 contained a June 25, 2012 conversation between the defendant and UC1 in which the defendant approvingly explained to UC1 the circumstances relating to the al-Qaeda directed murder of seven Americans on December 30, 2009. (Tr. 374-75). Moreover, in a December 2012 email authored by the defendant and admitted into evidence as Government's Exhibit 105, the defendant told UC2, whom he believed to be an AQAP leader, "there are no limitations, nothing that I won't do" for the terrorist group. (Tr. 381-82).

In terms of gauging both the defendant's intent and his understanding of the consequences of his actions, the government submits that the most significant and illuminating evidence in the record is the January 18, 2013 audio and video recording of the defendant, which was admitted into evidence as Government Exhibit 103. At a critical moment in the commission of the offense, just three days before the defendant attempted to travel to the Middle East, UC1 tried to discourage the defendant from pursing a path to violence. In Government's Exhibit 103, the defendant asserted that he would rather go to prison than to abandon his terrorist plot. Dr. Berrill's interpretation of the defendant's behavior on the video undermines the defendant's assertions that he was pressured into committing the terrorism offenses, and that he underestimated the consequences he faced. As Dr. Berrill explained:

> [T]he undercover agent told him unequivocally several times that he had an out, that he would feel very guilty that Mr. Kaliebe were to be killed if he went abroad, hurt if he went abroad, and this is something that he did not want him to do, and to reconsider the possibility of devoting himself to being a Muslim here in the United States and practicing as a Muslim without getting involved in any kind of terrorist activity. He also made the statement to Mr. Kaliebe, something to the effect of please don't do this for me. So he actually said don't do this for me. This is why Mr. Kaliebe said to him I'm not doing this for you, I'm doing this because of my commitment to my beliefs and my political beliefs as they emerged with respect to being radicalized, again, a sort of ironic comment as uttered by Mr. Kaliebe in this discussion which is, <u>even if they were to be apprehended and arrested in connection to his commitment to committing this offense he would rather spend his time in prison than to be seen as someone turning his back on Islam or not fulfilled his destiny</u>

8

> to participate in fighting abroad as part of Al Qaeda. So it was a very telling and very compelling conversation that occurred between the two, but <u>at no time was there any browbeating, was there any kind of strong-handing verbally, psychologically. There was no manipulation by the agent to force him to participate</u>.

(Tr. 305). Dr. Berrill further explained that this video recording was especially helpful in understanding the defendant's mental state and his ability to accurately perceive the choices that lay before him:

> Q. With respect to that January 18, 2013 video, did that assist you in determining the ability of the defendant to understand his conduct and the consequences of what that conduct would be?
>
> A. Well, it certainly reflected an intellectual understanding what the ramifications in the meeting was for his decision to go abroad and fight with Al Qaeda. There was a discussion, the possibility of being killed. There was, you know, discussion which you know reflected several dimensions that really could result in certainly harm to Mr. Kaliebe, and yes, he did understand. He was not confused. <u>There was no sense during the course of the conversation that he was baffled by what was said or didn't understand the intent of what was being said.</u> What was interesting to me too, he perceived from an emotional or affective perspective the facts that the undercover agent was saying I don't want to feel guilty if you should get hurt. That is important too in terms of understanding this notion that Mr. Kaliebe was demonstrating signs of autism or autism spectrum disorder or Asperger's because he was able to pick up on the affective dimension of what the agent was saying to him in expressing concerns he has for this guy. <u>Mr. Kaliebe accurately perceived that that was being said to him</u>, that there was an affective or emotional component and he responded by making it perfectly clear he would not hold this man accountable, it was not his fault if he made this decision. This was his decision.

(Tr. 306). In addition, with respect to the defendant's understanding of the identity of his intended victims, he told Dr. Berrill that he contemplated harming Americans: "He told me that he understood that his involvement with Al Qaeda would put him quite possibly at odds with the U.S. military, the U.S. government, and that in that context that he would in fact be fighting against the United States government and the military and he understood that fully." (Tr. 307). These admissions are consistent with statements the defendant made to UC1 during the investigation, when he contemplated taking action against U.S. Special Operations Forces.

9

> Ultimately, with respect to the defendant's mental state, Dr. Berrill concluded that the defendant's understanding of the nature and consequences of his actions was clear.
>
> Q. In your expert opinion, do you believe that the defendant fully appreciated and understood the nature and consequences of the conduct he engaged in and the consequences for those actions?
>
> A. I believe he did. I think he was able to verbalize a clear and complete understanding of the ramifications of what his involvement would mean, and to the extent that anyone can under the circumstances, he did not appear confused, he did not appear to be distraught, he did not appear to be demonstrating symptoms of psychiatric illness or other impairments.

(Tr. 309). Dr. Bardey acknowledged that the defendant understood right from wrong, but attempted to make the somewhat strained distinction of asserting that the defendant nevertheless failed to fully appreciate the consequences of his actions. (Tr. 237, 328). However, again, this claim is severely undermined by the evidence introduced during the hearing, most particularly, Government Exhibit 103, wherein the defendant repeatedly and stoically acknowledged the risks he faced by joining AQAP, including being injured or killed on the battlefield, his house being raided by law enforcement authorities, being arrested, going to prison and being held in solitary confinement. Government Exhibit 103. Further, the defendant analyzed those risks against the benefits of remaining on Long Island and practicing his faith in a nonviolent manner, which included going to college, getting a good job at a medical lab, and making a lot of money, and argued to UC1 why, for him, joining AQAP and pursuing martyrdom was the better and only choice. Id. Taken together, the defendant's statements clearly demonstrate that he understood the consequences of his actions and was able to articulately explain his rationale for his decision. Moreover, these statements by the defendant, including his demonstrated reverence for terrorist leaders such as Usama bin Laden and Anwar al-Awlaki, also highlight the danger this defendant presents to the United States and the need for a significant prison sentence.

The defendant's crimes were inchoate offenses. Law enforcement agents stopped him before he could join AQAP. Whether the defendant would successfully have made his way to a terrorist training camp or engaged in violence against Americans or other innocents is unknowable, although it certainly has happened before. As Detective Almodovar explained, Americans, including Americans from Long Island, have succeeded in joining and empowering al Qaeda and its affiliates. (Tr. 358). In the matter at hand, there is no question that the defendant acted knowingly and intentionally in his efforts to offer himself in support of AQAP. Like so many defendants in the criminal justice system, there are aspects of this defendant that engender sympathy. The crime he committed is among the most serious of all federal offenses, however, and the defendant's condition made him no less dangerous and no less committed to the extremist cause he embraced. If anything it may have made him more so. The defendant was remarkably resistant to redirection from his plot, and even abandoned the opportunity to pursue cooperation with

10

the government at a time when there was no question that he could provide substantial assistance to an ongoing terrorism investigation.

### C. The Defendant's Conduct is Comparable to the Conduct of Other Terrorism Defendants Sentenced in this District

As noted above, this post-hearing brief does not take the place of the government's previously filed sentencing submission, but rather supplements and supports the analysis set forth in that submission with the benefit of the record from the hearing. Accordingly, the government principally focuses on the two issues raised by the defendant in his request for a Fatico hearing. At the conclusion of the defendant's post-hearing brief, however, the defendant raised sentences in other terrorism cases in support of his mitigation argument. Notably absent from the defendant's catalog of sentences in other cases are any terrorism cases prosecuted in the Eastern District of New York. As EDNY is among the most active national security benches in the United States, such cases are not difficult to find, and may provide helpful context for the Court.

As a starting point, Judge Feuerstein's 25-year sentence of codefendant Marcos Alonso Zea is instructive because the defendant and Zea were involved in the same scheme to support AQAP. Zea's offense conduct was similar, though in some ways distinguishable from that of the defendant's (e.g., in addition to attempting to join AQAP, Zea endeavored to obstruct justice while under investigation by the Joint Terrorism Task Force). See United States v. Zea, No. 15-1531-CR, 2016 WL 4578749, at *2 (2d Cir. Sept. 1, 2016) (affirming conviction and sentence based on terms of plea agreement). In addition, because investigators learned of Kaliebe's plans before he attempted to travel, they had the opportunity of attempting to dissuade him. Rather than abandon his plans, however, Kaliebe made unequivocal statements, which were recorded, regarding his unwavering support for violent Islamic extremism. Zea never had the benefit of the opportunity to be redirected before he traveled.

Other sentences imposed in terrorism cases in the Eastern District of New York include:

- Betim Kaziu, 09 CR 660 (JG) **27 years** (American citizen traveled from Brooklyn to Egypt and then Kosovo in connection with conspiracy and attempt to provide material support to terrorists)

- Agron Hasbajrami, 11 CR 623 (JG) **16 years** (legal permanent resident of Brooklyn arrested at JFK airport for attempting to travel overseas to provide material support to terrorists)

- Adis Medunjanin, 10 CR 19 (JG) **Life** (defendant traveled overseas and received training and direction from al-Qaeda, apprehended in connection with conspiracy to detonate bombs on New York City subways)

11

- Quazi Mohammad Rezwanul Ahsan Nafis, 12 CR 720 (CBA) **30 years** (arrested in FBI sting operation after attempting to detonate what he believed to be an explosive device in lower Manhattan)

- Lawal Olaniyi Babafemi, 13 CR 109 (JG) **22 years** (Nigerian citizen convicted of conspiring to provide and providing material support to AQAP, the same group the defendant sought to support)

- Abdel Hameed Shehadeh, 10 CR 1020 (ENV) **13 years** (defendant from Staten Island convicted of making false statements to FBI in connection with terrorism investigation)

- Russell Defreitas, 07 CR 543 (DLI) **Life** (plot to destroy infrastructure at JFK airport)

- Ali Yasin Ahmed, 12 CR 661 (JG) **11 Years** (defendant traveled from Sweden to Somalia to support al-Shabaab)

- Abid Naseer, 10 CR 19 (RJD) **40 years** (conspiracy to provide material support to al-Qaeda)

The defendant's offense conduct falls within the range of EDNY terrorism cases set forth above. Like many of the other defendants prosecuted in this district, law enforcement authorities prevented the defendant from achieving the object of his intent – they stopped him before he could join a foreign terrorist group. In similar circumstances, courts in this district have recognized the seriousness of such an offense, and the need to fashion sentences that provide just punishment and deterrence. See 18 U.S.C. § 3553(a)(1)-(2). Finally, as set forth above, the defendant's co-conspirator, Ali Zea, was sentenced to 25 years by Judge Feuerstein and this Court's sentence must "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct[.]" 18 U.S.C. § 3553(a)(6).

IV.   Conclusion

While the defendant's age and unusual physical condition tilt in favor of some measure of leniency at sentencing, the defendant's fierce commitment to violent extremism, as captured in numerous recorded conversations and emails, including the exhibits introduced during the Fatico hearing, emerges as the most salient fact when all of the 3553(a) factors are considered together. As set forth in the government's initial sentencing submission, and as reinforced by the record at the Fatico hearing, the government agrees that a modest downward departure or non-Guidelines sentence, below 360 months' imprisonment, may be appropriate in this case based on the defendant's partial cooperation, age and medical condition. The government respectfully submits, however, that a below-Guidelines sentence of 24 years' imprisonment to be followed by a lengthy term of supervised release is appropriate in light of the other sentencing factors, which include the

need to provide just punishment for the offense, promote respect for the law and protect the public.

                                                Respectfully submitted,

                                                ROBERT L. CAPERS
                                                United States Attorney

                              By:    /s/_____
                                                Seth D. DuCharme
                                                John J. Durham
                                                Assistant U.S. Attorneys
                                                (718) 254-6021 /(631) 715-7851


cc:    Anthony La Pinta, Esq. (By ECF and email)
       USPO Steven Guttman (By email)